No. 26-5178

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

TENNESSEE RIVERKEEPER,

Plaintiff - Appellant,

v.

CRYSTAL RAY

Defendant

RICKY RAY, dba RR Farms, aka RR Farms Mass Grading

Defendant - Appellee

----------------------------------

Appeal from the United States District Court for the
Middle District of Tennessee

---------------------------------

-----------------------

# BRIEF OF APPELLANT,
# TENNESSEE RIVERKEEPER, INC.

-----------------------

Mark E. Martin
P.O. Box 1486
Oneonta, Alabama 35121
(205) 516-9350
Counsel for Appellant,
Tennessee Riverkeeper, Inc.

# TABLE OF CONTENTS

**TABLE OF CONTENTS ........................................................................ II**

**TABLE OF AUTHORITIES ....................................................................III**

**STATEMENT IN SUPPORT OF ORAL ARGUMENT ...............................III**

**STATEMENT OF JURISDICTION...............................................................2**

**STATEMENT OF ISSUES ..........................................................................3**

**STATEMENT OF THE CASE.....................................................................4**

**SUMMARY OF THE ARGUMENT ............................................................11**

**STANDARD OF REVIEW ..........................................................................11**

**ARGUMENT ..............................................................................................14**

**CONCLUSION............................................................................................46**

**CERTIFICATE OF COMPLIANCE ............................................................47**

**ADDENDUM ..............................................................................................48**

**DESIGNATION OF RELEVANT DOCUMEMTS ........................................48**

# TABLE OF AUTHORITIES

## STATUTES

28 U.S.C. § 1291 ---------- 1

28 U.S.C. § 1331 ---------- 1

33 U.S.C. § 1362(6) ---------- 28

33 U.S.C. §1365 (a)(1) ---------- 1, 4

42 U.S.C. § 6903 ---------- 33

42 U.S.C. § 6944(a) ---------- 43

42 U.S.C. § 6972(a)(1)(A) ---------- 1, 4

42 U.S.C. 6901 ---------- 32

42 U.S.C. 6943 ---------- 33

42 U.S.C. 6943(a) ---------- 34

42 U.S.C. 6944 ---------- 33

42 USC 6902(a) ---------- 32

T.C.A. Title 68, Chapter 211, Part 7 ---------- 38

## REGULATIONS

40 C.F.R. § 122.41 ---------- 19

40 C.F.R. §§ 257 ---------- 39

40 C.F.R. §257.3-3 ---------- 4

40 CFR 257 ---------- 36

80 Fed. Reg. 21302, 21348 (Apr. 17, 2015) ---------- 41

Tenn. Comp. R. & Regs. 0400-11-01-.02(1)(b)(3)(xiii) ---------- 31

Tenn. Comp. R. & Regs. 0400-11-01-.02(1)(b)(3)(xxi) ---------- 40

Tenn. Comp. R. & Regs. 0400-11-01-.02-(1)(c)(2) ---------- 38

Tenn. Comp. R. & Regs. 0400-11-01-.02-(c). ---------- 38

Tenn. Comp. R. & Regs. 0400-11-01-.02-(e) ---------- 38

Tenn. Comp. R. & Regs. 0400-11-01-.02-(g) ---------- 38

Tenn. Comp. R. & Regs. 0400-11-01-.02-(i) ---------- 39

Tenn. Comp. R. & Regs. 0400-11-01-.04 ---------- 39

Tenn. Comp. R. & Regs. 0400-11-01-.04-(1)(b)(5) ---------- 39

Tenn. Comp. R. & Regs. 0400-11-01-.04-(9) ---------- 37

Tenn. Comp. R. & Regs. 0400-11-01-.04-(9)(a)6(i) ---------- 37

Tenn. Comp. R. & Regs., Chapter 400-40-03-4(d). ---------- 26

FEDERAL CASES

*Am. Canoe Ass'n v. D.C. Water & Sewer Auth.*, 306 F. Supp. 2d 30 (D.D.C. 2004) ---------- 20

*Blue Legs v. U.S. E.P.A.*, 668 F.Sup. 1329 (D. S.D. 1987) ---------------------------34

*Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 585 F.3d 267 (6th Cir. 2009). -45

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481 (2d Cir. 2001).------------------------------------------------------------- 29, 30

*City of Mountain Park v. Lakeside at Ansley, LLC*, 560 F. Supp. 2d 1288 (N.D. Ga. 2008)-------------------------------------------------------------------------------29

*Davis v. Sun Oil Co.*, 148 F.3d 606 (6th Cir, 1998).------------------------------------44

*Driscoll v. Adams*, 181 F.3d 1285 (11th Cir. 1999)------------------------------------28

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149 (4th Cir. 2000) --------------------------------------------------------------------------19

*Gregory v. Shelby Cnty.*, 220 F.3d 433 (6th Cir. 2000) -------------------------------16

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49 (1987) -----21

*Imwalle v. Reliance Med. Prods. Inc.*, 515 F.3d 531 (6th Cir. 2008)----------- 13, 29

*Inland Empire Waterkeeper v. Corona Clay Co.*, 17 F.4th 825 (9th Cir. 2021) -- 19, 20

*N.C. Shellfish Growers Ass'n v. Holly Ridge Assocs., LLC*, 278 F. Supp. 2d 654 (E.D.N.C. 2003). -------------------------------------------------------------------29

*Okanogan Highlands All. v. Crown Res. Corp.*, 544 F. Supp. 3d 1092 (E.D. Wash. 2021)--------------------------------------------------------------------------- 19, 20

*Olsen v. Am. Steamship Co.*, 176 F.3d 891 (6th Cir. 1999 ---------------------------- 18

*Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty.*, 268 F.3d 255 (4th Cir. 2001)------------------------------------------------------------------------------ 31

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)------------------ 30

*Russello v. United States*, 464 U.S. 16 (1983) ------------------------------------------ 41

*Rybachek v. EPA*, 904 F.2d 1276 (9th Cir. 1990). -------------------------------------- 28

*S. Rd. Assocs. v. IBM*, 216 F.3d 251 (6th Cir., 2000). ---------------------------------- 43

*See Black Warrior Riverkeeper, Inc. v. Cherokee Mining, LLC*, 548 F.3d 986 (11th Cir. 2008) ---------------------------------------------------------------------------- 22

*Sierra Club v. ICG Hazard, LLC*, 781 F.3d 281 (6th Cir. 2015) -------------------- 30

*Sierra Club v. Simkins Indus.*, 847 F.2d 1109 (4th Cir. 1988)----------------------- 19

*United States v. Cundiff*, 555 F.3d 200 (6th Cir. 2009)------------------ 11, 15, 28, 30

*United States v. Hamel*, 551 F.2d 107 (6th Cir. 1977)--------------------------------- 28

*United States v. Reed*, 72 F.4th 174 (6th Cir. 2023) ----------------------------------- 13

*United States v. You*, 74 F.4th 378 (6th Cir. 2023)------------------------------------ 14

*Williams ex rel. Hart v. Paint Valley Local Sch. Dist.*, 400 F.3d 360 (6th Cir. 2005) ------------------------------------------------------------------------------------- 13

*Yadkin Riverkeeper, Inc. v. Duke Energy Carolinas, LLC*, 141 F. Supp. 3d 428 (M.D.N.C. 2015) -------------------------------------------------------------------- 19

UNITED STATES SUPREME COURT CASES

*City of Chicago v. Env't Def. Fund*, 511 U.S. 328 (1994)----------------------------41

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88 (1992) ------------------------43

*Hines v. Davidowitz*, 312 U.S. 52 (1941) ---------------------------------------------42

*Kisor v. Wilkie*, 588 U.S. 558 (2019) -----------------------------------------------42

UNITED STATES CONSTITUTION

U.S. Const., art. VI, cl. 2 -------------------------------------------------------------44

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

This appeal presents issues of first impression for this Honorable Court and oral argument would significantly aid the decisional process.

## STATEMENT OF JURISDICTION

1. The District Court had subject-matter jurisdiction over Plaintiff's by virtue of Section 505(a)(1) of the Federal Water Pollution Control Act ("FWPCA") , also known as the Clean Water Act ("CWA"), 33 U.S.C. §1365 (a)(1), section 7002 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(A), and by virtue of 28 U.S.C. § 1331 (actions arising under the Constitution or laws of the United States).

2. The district court entered a final judgment for the defendant on May 30, 2025. (R. 124, PageID # 1573). Plaintiff timely moved to alter or amend the judgment, or for a new trial under Federal Rule of Civil Procedure 59(a), (e), on June 27, 2025. (R.126, PageID # 1582 - 1584). The district court denied that motion on January 28, 2026. (R.138, PageID # 2131).

3. This Court has appellate jurisdiction under 28 U.S.C. § 1291. The Rule 59(e) motion tolled the time to appeal. Fed. R. App. P. 4(a)(4)(A). Plaintiff timely filed a notice of appeal on February 26, 2026. R.139, PageID #: 2132 – 2133.

4. The appeal is from a final judgment or order that disposes of all parties' claims.

## STATEMENT OF ISSUES

1. Whether the District Court erred in granting Defendant's Rule 50 motion and thereby dismissing Count One of the Amended Complaint, incorrectly holding that Plaintiff must prove the discharge of a pollutant for all Clean Water Act Violations and had failed to do so for any violation.

2. Whether the District Court erred in granting judgment as a matter of law under Rule 50(a) on Riverkeeper's CWA claim where uncontradicted photographic, video, and testimonial evidence depicted visibly turbid, discolored stormwater discharging from defendant's active landfill into Sulphur Creek, and the Rule 50(a) standard required all reasonable inferences be drawn in Riverkeeper's favor.

3. Whether the District Court erred in instructing the jury to consider Tennessee's regulatory exemption for a solid waste disposal permit for a Class IV Construction and Demolition Landfill.

## STATEMENT OF THE CASE

Crystal and Ricky Ray conduct business under the names RR Farms and RR Farms Mass Grading[1]. The facility is paid a fee to receive and permanently dispose of massive amounts of excavated soil, stone, concrete, and other material from construction sites and have created two huge mounds of the materials, each raised approximately 200 feet above the original elevation of the site. The site is approximately 38.56 acres.

They should have but did not apply for a Tennessee solid waste disposal permit, which was provided for under Tenn. Comp. R. & Regs. 0400-11-01, *et seq*. The Rays, instead, claimed to be a construction site and applied for and received a General NPDES Permit for Discharges of Stormwater Associated with Construction Activities, GCSP, R.58-9, PageID#: 501 – 590. which contains no numeric discharge limitations for any pollutant.

Defendant Ray has not complied with the requirements of this permit and has made insufficient efforts to contain muddy runoff from the property. The runoff is causing water quality violations, excessive turbidity, and the deposition of siltation in tributaries of Sulphur Creek, Sulphur Creek itself, and/or the Cumberland River.

---

1 The Rays later divorced and Crystal Ray was dismissed from the case.

The Amended Complaint, R. 48, PageID #: 296, brings claims pursuant to the provisions of Section 505(a)(1) of the Federal Water Pollution Control Act, also known as the Clean Water Act (hereinafter "CWA"), as amended, 33 U.S.C. § 1365(a)(1), and section 7002 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(A).

Count One contains violations of the Clean Water Act, including failure to conduct and submit a site assessment, failure to install and maintain best management practices, discharge quality violations, and state water quality violations, among others.

Count Two alleges violations of the RCRA opening dumping prohibition provisions for failure to obtain a landfill permit but alleged as well that the site constitutes an open dump, pursuant to 40 C.F.R. §257.3-3, because contaminated stormwater has been discharged from the site in violation of the "requirements of the NPDES of the CWA." It goes on to allege that the site is an open dump because it is a landfill that has failed to obtain a permit.

Count Three alleged violations of RCRA due to operating an open dump due to failing to satisfy the criteria in 40 C.F.R. §§ 257.1 through 257.4 or §§257.5 through 257.30 or §§257.50 through 257.107. Count Three was dismissed by the Plaintiff prior

to trial, but the open dumping allegations of Count Two were not dismissed by the Plaintiff.

At trial, Nicholas Keck testified for the Plaintiff. Transcript, R. 131, PageID#: 1774. He and his wife bought property on Sulphur Creek in December 2019 with the intent of building their "forever home". He has 3.4 acres with a "beautiful" creek at the back and a little creek that runs along one side. Since Ray's landfill was constructed, the creeks are not as appealing. They're often dirty, the water gets "really brown" with "a lot of sediment" that "accumulates." He introduced exhibits 6 through 10 as photographs he took on April 3, 2025.

Keck identified exhibit 6 as a photograph he took at the "base of Dirt Mountain"2. The photograph shows "all the dirt on the right-hand side in the water" and clear water on left-hand side from a neighbor, and the "mixing of the dirty water with what should be the clear water." He went on to describe the water as "visibly muddy." He testified that the water goes into a drain that then feeds into his land across the highway.

He testified the Exhibit 7 shows "muddy water" from "Dirt Mountain" in the stream that runs along the entire east side of his property. He testified he finds the color of the water to be objectionable.

Exhibit 8 shows the entrance of his property and the stream that runs along his property and then feeds into Sulphur Creek at the back of his property. It shows "a lot of mud and accumulation of sediment. It's very dirty water and spewing all over into my property." He further said he found the color of the water to be objectionable.

Exhibits 9 and 10 also shows "muddy water" in the same creek. He followed the creek all the way up to "Dirt Mountain." He found the color of the water, visible in both photographs, to be objectionable.

Defendant Ricky Ray was called to testify by the Plaintiff. He admitted he has never conducted a site assessment on the site. R 131, PageID #: 1814. He stated the total acreage is 38 acres and there are two outfalls. R 131, PageID #: 1814 – 1815. He admitted that he has never updated his Stormwater Pollution Prevention Plan. Transcript, R. 131 PageID #: 1816. He admitted that although construction of the stormwater retention pond was started in the year 2020, it was not completed until 2023. All three of these admissions prove violations of the GCSP and thus the CWA.

Frank Canale was called as a witness by the Plaintiff. Mr. Canale testified that he lives next door to Ray's site. He testified that when the site was built, he was not given any notice or right to comment. He estimated that tens of thousands of dump trucks went to the site with "rock and gravel and whatever." He testified about

2 "Dirt Mountain" is the name the locals have for Ray's landfill.

"muddy water" he saw coming from Ray's property and introduced two videos he took of water flowing into a drain under the highway. He used a clear drinking water glass to collect some of the water and the videos show water so dark that no light passes through the water in the glass. Transcript, R. 132, PageID #: 1861.

Barry Sulkin testified for the plaintiff. He introduced exhibits 12 through 58 as photographs taken by him on or in the vicinity of the Ray landfill. Transcript, R. 132, PageID # 1897.Exhibits 12 through 28 and 46 through 58 were taken on January 3, 2023, June 29, 2023, July 8, 2023, July 19, 2023, August 3, 2023, August 12 and 13, 2023, February 9 and 28, 2024, April 11, 2024, May 8 and 9, 2025, and May 20, 2025. Together they showed thirteen days where what Sulkin characterized as "muddy water" was seen and photographed leaving the Ray's site and flowing to Sulphur Creek and the Cumberland River. They also show three days where muddy water from the Ray landfill was observed and photographed entering the cleaner water of Sulphur Creek with a visible contrast of color in such amounts that an objectional appearance to the water could be found.

Exhibits 29 through 45 were taken September 21, 2023, on site at Ray's landfill. They show the large amount of debris, including concrete, rock, gravel, pieces of metal pipe, asphalt, and even an automobile tire that had been disposed of there.

After the close of evidence the Court considered Ray's oral 50(a) motion and issued a judgment as a matter of law dismissing Count One "because Tennessee Riverkeeper failed to offer *any* evidence proving a discharge of *pollutants* within the scope of the Clean Water Act." The Court's order stated, "Most, if not all, of the [Plaintiff's] witnesses described the flowing water as 'muddy,' but no witness offered any testimony on *why* the water was 'muddy'." R. 125, PageID #: 1579.

Count Two was allowed to go to the jury for determination. Jury instructions were given by the Court.

> If you find that Tennessee Riverkeeper has not proven by a preponderance of the evidence that Mr. Ray is operating a construction and demolition landfill, then Mr. Ray is not liable for violating the RCRA. If you determine that RR Farms is a Class IV construction and demolition landfill, then you must determine if Mr. Ray is exempted from the landfill permit requirement. Tennessee regulations provide that the use of solely natural rock, dirt, stumps, pavement, concrete, and rebar, and/or brick rubble as fill material does not subject a Class IV construction and demolition landfill to the requirement to have a permit. You should apply the common, ordinary meaning of the term "fill material," which is defined in the dictionary as "any material placed on the surface of the ground, especially wet ground, in order to raise it." Accordingly, it will be up to you to decide whether Mr. Ray has proven by a preponderance of the evidence that RR Farms engages in the use of solely natural rock, dirt, stumps, pavement, concrete, and rebar, and/or brick rubble as fill material. If you find that Mr. Ray has met his burden on this issue, then you should note that on the verdict form, which I will instruct you on -- with you later.
>
> Transcript, R. 133, PageID #: 2095.
>
> The jury was given a verdict form with two questions to answer.

1. Did Tennessee Riverkeeper prove, by a preponderance of the evidence, that RR Fauns is a Class IV construction and demolition landfill?

2. Did Ricky Ray prove, by a preponderance of the evidence, that he was not required to obtain a landfill permit because RR Farms engages in the use of solely natural rock, dirt, stumps, pavement, concrete and rebar, and/or brick rubble as fill material? R. 123, PageID #: 1572.

The jury answered "Yes" to both questions.

The Court entered the following judgment:
Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.
IT IS ORDERED AND ADJUDGED that the jury found as follows:
- By a preponderance of the evidence Tennessee Riverkeeper, Inc., proved that RR Farms is a Class IV construction and demolition landfill.
- By a preponderance of the evidence Ricky Ray proved that he was not required to obtain a landfill permit because RR Farms engages in the use of solely natural rock, dirt, stumps, pavement, concrete and rebar, and/or brick rubble as fill material.
IN ACCORDANCE WITH THE VERDICT OF THE JURY RENDERED ON MAY 29, 2025, JUDGMENT IS HEREBY ENTERED IN FAVOR OF THE DEFENDANT.
R. 124, PageID#: 1573.

After the trial judgment, Plaintiff Riverkeeper timely filed Plaintiff's Motion to Alter or Amend Judgment or, in the Alternative, for New Trial. R.126 PageID #: 1582.

The trial court denied Plaintiff's motion in its entirety. R.137 PageID #: 2117 – 2130.

Plaintiff filed a timely appeal to this Court. R.139 PageID #: 2132 – 2133.

## SUMMARY OF THE ARGUMENT

### I. Sufficient Evidence of a Pollutant Discharge Supported Count One of Riverkeeper's Complaint. Granting Defendant's Rule 50 Motion was Clear Error.

Count One alleges Defendant Ray violated his NPDES General Construction Stormwater Permit. The district court granted Rule 50 at the close of Riverkeeper's case-in-chief on the ground that Riverkeeper had failed to prove the discharge of a pollutant. That ruling is erroneous for two independent reasons.

First, some of the violations alleged, such as the failure to submit site assessments as required by GCSP §5.5.3.8, failure to implement or update the Storm Water Pollution Prevention Plan (SWPPP) as required by GCSP § 1.4.2, and related procedural permit violations are actionable under 33 U.S.C. §1365(f) without proof of the discharge of a pollutant. The Clean Water Act's (CWA) citizen-suit provision authorizes enforcement of "a permit or a condition thereof," and Riverkeeper presented unrebutted evidence of those violations. The district court's threshold ruling that Riverkeeper waived this theory in the Pretrial Order is also incorrect – and contradicts the Pretrial Order the district itself signed.

Second, even if discharges were required to sustain these permit violations, Riverkeeper presented sufficient evidence from which a reasonable jury could find a

violation. The GCSP imposes visual, not numeric, standards: any discharge containing suspended solids, turbidity, or color "in such amounts or character that will result in any objectionable appearance" violates the permit. GCSP § 6.3.2(c). Riverkeeper produced photographs, video, and testimony depicting visibly turbid, discolored runoff entering Sulphur Creek from Ray's landfill. And at trial, Ray testified that he imports rock, sand, and dirt to his landfill. Under settled Sixth Circuit law, the rock, sand, and dirt that comprise such sediment are themselves "pollutants" under 33 U.S.C. § 1362(6). *United States v. Cundiff*, 555 F.3d 200, 213 (6th Cir. 2009).

## II. The District Court Erred in Granting Judgment as a Matter of Law Under Rule 50(a) on Riverkeeper's CWA Claim Where Uncontradicted Photographic, Video, and Testimonial Evidence Depicted Visibly Muddy, Discolored Stormwater Discharging From Defendant's Active Landfill Into Sulphur Creek, and the Rule 50(a) Standard Required all Reasonable Inferences be Drawn in Riverkeeper's Favor.

Witnesses at Trial presented sufficient evidence to prove the standard found in the Ray's NPDES GCSP Permit, the existence of a discharge from Ray's property that contained total suspended solids, turbidity or color in such amounts or character that resulted in an objectional appearance to the water. There are no numeric limitations of any pollutant in the permit. Laboratory tests of the discharged water do not prove the subjective standards found in the GCSP.

Notwithstanding the above arguments, Plaintiff contends it presented substantial and sufficient evidence of the discharge of a pollutant because, under the CWA, muddy water can constitute a pollutant even without specific proof of what contaminant is present in the water, because sediment itself—the material that makes water muddy—is a pollutant under the statute.

Furthermore, a jury may infer the existence of a necessary element of a civil complaint when the inference is reasonable and supported by the evidence presented, with circumstantial evidence carrying the same weight as direct evidence in establishing such inferences.

## Ill. The District Court Erred in Instructing the Jury to Consider Tennessee's Regulatory Exemption for a Solid Waste Disposal Permit for A Class IV Construction and Demolition Landfill.

The district court instructed the jury that Ray could establish the fill-material exemption found in Tenn. Comp. R. & Regs. 0400-11-01-.02(1)(b)(3)(xiii) as a matter of state law. The jury accepted that defense and found that Ray uses "rock, dirt, stumps, pavement, concrete and rebar, and/or brick rubble as fill material." Verdict, Verdict, R. 123, PageID#: 1572. The district court then applied the exemption as a matter of law to defeat Count Two — even though the same jury had separately found that Ray's site is a Class IV construction and demolition landfill. (*Id.*)

That instruction was error for two independent reasons. First, the exemption is

ambiguous, and the canons of construction require it to be read narrowly to avoid creating a regulatory gap — one that converts a facility from sanitary landfill to prohibited open dump precisely by exempting it from the federal floor. Second, even if the exemption were unambiguous, its application here is preempted by RCRA as applied.

## STANDARD OF REVIEW

1. This Court reviews a Rule 50 ruling *de novo,* applying the same standard as the district court. The evidence is viewed in the light most favorable to the non-movant, who receives the benefit of all reasonable inferences; the Court does not weigh evidence or assess credibility. *Imwalle v. Reliance Med. Prods. Inc.*, 515 F.3d 531, 543 (6th Cir. 2008). Judgment as a matter of law is proper only if "reasonable minds could not come to a conclusion other than one favoring the movant." *Id.* Because the district court granted Rule 50 at the close of Riverkeeper's case-in-chief, the evidence and all reasonable inferences are construed in Riverkeeper's favor.

2. The legal accuracy of a jury instruction is a question of law reviewed de novo. *United States v. Reed*, 72 F.4th 174, 188 (6th Cir. 2023); *Williams ex rel. Hart v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 365 (6th Cir. 2005). Where the appellant challenges the legal correctness of the instruction itself — as Riverkeeper does here

— review is de novo even if instructional matters generally would receive abuse-of-discretion review. *United States v. You*, 74 F.4th 378, 397 (6th Cir. 2023).

## ARGUMENT

### I. Sufficient Evidence of a Pollutant Discharge Supported Count One of Riverkeeper's Complaint. Granting Defendant's Rule 50 Motion was Clear Error.

### A. Introduction.

Count One alleges Defendant Ray violated his NPDES General Construction Stormwater Permit. GCSP, R.58-9, PageID#: 501 – 590. The district court granted Rule 50 at the close of Riverkeeper's case-in-chief on the ground that Riverkeeper had failed to prove the discharge of a pollutant. That ruling is erroneous for two independent reasons.

First, some of the violations alleged, such as the failure to submit site assessments as required by GCSP §5.5.3.8, failure to implement or update the Storm Water Pollution Prevention Plan (SWPPP) (R.58-3, PageID #: 430-469) as required by GCSP § 1.4.2, and related procedural permit violations are actionable under 33 U.S.C. §1365(f) without proof of the discharge of a pollutant. The Clean Water Act's (CWA) citizen-suit provision authorizes enforcement of "a permit or a condition thereof," and Riverkeeper presented unrebutted evidence of those violations. The district court's

threshold ruling that Riverkeeper waived this theory in the Pretrial Order is also incorrect – and contradicts the Pretrial Order the district itself signed.

Second, even if discharges were required to sustain these permit violations, Riverkeeper presented sufficient evidence from which a reasonable jury could find a violation. The GCSP imposes visual, not numeric, standards: any discharge containing suspended solids, turbidity, or color "in such amounts or character that will result in any objectionable appearance" violates the permit. GCSP § 6.3.2(c). Riverkeeper produced photographs, video, and testimony depicting visibly turbid, discolored runoff entering Sulphur Creek from Ray's landfill. And at trial, Ray testified that he imports rock, sand, and dirt to his landfill. Under settled Sixth Circuit law, the rock, sand, and dirt that comprise such sediment are themselves "pollutants" under 33 U.S.C. § 1362(6). *United States v. Cundiff*, 555 F.3d 200, 213 (6th Cir. 2009).

## B. Riverkeeper's Procedural-Permit Violation Claims Were Preserved and Supported by Sufficient Evidence.

### A. The Pretrial Order Preserved the Procedural-Permit-Violation Theory.

The district court ruled that Riverkeeper waived its procedural-permit-violation theory by failing to articulate it in the Pretrial Order. R. 137, PageID#: 2117 – 2130, 2123. That ruling cannot be reconciled with the Pretrial Order itself.

The Pretrial Order is the operative trial document. By its own terms, it "supplants the pleadings." (R. 92 ¶ 1, PageID#: 1323.) The question for forfeiture purposes is therefore not what the Amended Complaint pleaded but what the Pretrial Order encompasses. *See* Fed. R. Civ. P. 16(d), (e); *Gregory v. Shelby Cnty.*, 220 F.3d 433, 442-43 (6th Cir. 2000) (forfeiture under Rule 16 requires complete absence of the theory from the pretrial order).

The Pretrial Order encompasses the procedural-permit-violation theory expressly. In its "Statement of the Issues for the Jury," the order enumerates thirteen separate procedural-permit-violation issues for jury determination. Among them:

> 9. Did the Defendants violate the NPDES permit by failure to conduct and submit a required site assessment or an updated site assessment?
> 10. Did the Defendants violate the NPDES permit by failure to implement the Stormwater Pollution Prevention Plan (SWPPP) and maintain effective Best Management Practices (BMPs) from commencement of construction activity until permanent stabilization is complete?
> 11. Did the Defendants violate the NPDES permit due to failure to perform twice weekly site inspections to ensure proper installation, maintenance, and overall effectiveness of EPSCs . . . ?

R. 92 ¶ 5(9), (14), (21). PageID#: 1326 -1328. Each issue asks whether Ray "violate[d] the NPDES permit by failure to" perform a discrete operational requirement. None requires proof of a pollutant discharge. Each is framed as a permit violation in its own right.

The Pretrial Order treats the discharge issues independently. Issues 5 through 8 — "Did the Defendants discharge pollutants?"; "Did the Defendants' discharge reach navigable waters?"; "Is the discharge of pollutants continuing and ongoing?"; "Is the discharge of pollutants in violation of a NPDES permit?" — appear separately, and earlier, in the Statement of Issues. R. 92 ¶ 5(5)-(8). PageID#: 1326. The architecture of the Pretrial Order distinguishes discharge-occurred issues from procedural-permit-violation issues and submits both sets to the jury.

The district court certified that architecture when it signed the Pretrial Order on May 14, 2025. R. 92 at 9, PageID# 1331. Two weeks later, at the close of Riverkeeper's case-in-chief, the same court ruled that Riverkeeper had waived the procedural-permit-violation theory by failing to articulate it in the Pretrial Order. The ruling and the order cannot both stand.

The mismatch is plain on the face of the record. The Pretrial Order certified thirteen procedural-permit-violation issues for jury determination. R. 92 ¶ 5(9)-(21), PageID# 1326 – 1328. The verdict form contains no Clean Water Act questions at all. R. 123, PageID#: 1572. That silence exists because the district court granted Rule 50 at the close of Riverkeeper's case-in-chief, before any of the certified procedural issues could be put to the jury. The court's Rule 50 ruling thereby withdrew from the jury thirteen issues the court had committed to it — and did so on a single ground, the

absence of pollutant-discharge proof, that has no application to procedural-permit violations actionable under 33 U.S.C. § 1365(f). The error compounded itself: a discharge requirement misapplied to non-discharge claims, sweeping away an entire trial's worth of certified issues at once.

Forfeiture under Rule 16(e) follows from a party's failure to advance a theory of recovery in the pretrial order. *Gregory v. Shelby Cnty.*, at 442. (citing *Olsen v. Am. Steamship Co.*, 176 F.3d 891 (6th Cir. 1999)). Mere mention in the complaint will not preserve a theory that does not appear in the operative pretrial document. *Id.* at 442-43 (holding theory waived where it was identified in the complaint but not in the joint pretrial order). The rule is straightforward: the pretrial order is the controlling document, and theories must be affirmatively advanced there.

Riverkeeper satisfied that rule. The procedural-permit-violation theory was not merely mentioned in the Amended Complaint; it was affirmatively advanced in the Pretrial Order, thirteen times, as discrete issues identified for jury determination. R. 92 ¶ 5(9)-(21), PageID#: 1326 – 1328. The theory was preserved as a matter of law.

### C. Section 1365(f)(7) Authorizes Citizen Enforcement of Permit Conditions Without Requiring Proof of Pollutant Discharge.

The CWA's citizen-suit provision authorizes any citizen to bring suit against any person "who is alleged to be in violation of . . . an effluent standard or limitation

under this chapter." 33 U.S.C. § 1365(a)(1). Section 1365(f) defines "effluent standard or limitation" to include "a permit or condition thereof." 33 U.S.C. § 1365(f)(7). Permit conditions — monitoring, reporting, SWPPP, BMP, and other operational requirements — are therefore independently enforceable in a citizen suit. *Sierra Club v. Simkins Indus.*, 847 F.2d 1109, 1114-15 (4th Cir. 1988) (monitoring and reporting violations actionable in citizen suit despite no proof of underlying discharge); *Inland Empire Waterkeeper v. Corona Clay Co.*, 17 F.4th 825, 833 (9th Cir. 2021) (same; non-discharge permit violations actionable); *Okanogan Highlands All. v. Crown Res. Corp.*, 544 F. Supp. 3d 1092, 1097-98 (E.D. Wash. 2021) (citizen suit may rest on permit-condition violations without proof of pollutant content); *Yadkin Riverkeeper, Inc. v. Duke Energy Carolinas, LLC*, 141 F. Supp. 3d 428, 448 (M.D.N.C. 2015) (same); *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 152 (4th Cir. 2000) (recognizing broad scope of § 1365(f)). EPA's implementing regulation states the rule directly: "The permittee must comply with all conditions of this permit. Any permit noncompliance constitutes a violation of the Clean Water Act and is grounds for enforcement action . . . ." 40 C.F.R. § 122.41.

As the Fourth Circuit explained in *Simkins*, citizen enforcement of monitoring and reporting conditions "is essential to the act's overall enforcement scheme,"

because "the failure to comply with reporting requirements is itself a substantive violation, regardless of whether the underlying conduct . . . constituted a violation." 847 F.2d at 1114. The reasoning extends to every operational permit condition Congress chose to make enforceable through § 1365(f): the violation lies in the noncompliance itself, not in any discharge that may or may not have followed.

The Ninth Circuit's holding in *Corona Clay* is direct: "Clean Water Act citizen suits may rest on non-discharge violations of a permit." 17 F.4th at 833. The reason flows from the statute's "unmistakably clear language," which authorizes citizen suits for violations of "a permit or condition thereof" and "never mentions 'discharges'." *Okanogan Highlands All. v. Crown Res. Corp.*, 544 F. Supp. 3d 1092, 1097-98 (E.D. Wash. 2021). On that basis, citizens have enforced a wide range of non-discharge permit conditions: monitoring and reporting, *Inland Empire*, 17 F.4th at 832; failure to install required equipment, *Am. Canoe Ass'n v. D.C. Water & Sewer Auth.*, 306 F. Supp. 2d 30, 37 (D.D.C. 2004); and construction-schedule provisions for treatment facilities, *id.* at 43.

The district court read these cases — *Corona Clay* in particular — as requiring Riverkeeper to prove a pollutant discharge to maintain a permit-condition claim. (R. 137 n.6, PageID#: 2126.) That reads the cases backwards. *Corona Clay* requires only that some discharge into navigable waters has occurred to satisfy the CWA's

jurisdictional predicate. 17 F.4th at 836. It does not require proof of the pollutant content of any particular discharge to support claims for procedural permit violations. *Corona Clay*, in fact, holds the opposite: "*Gwaltney* permits a citizen suit based [on] ongoing or imminent procedural violations." *Id.* (citing *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49 (1987)).

Here, the jurisdictional predicate is undisputed. The Pretrial Order itself enumerates as an issue for the jury whether the Defendants discharged contaminated stormwater on sixteen specified dates ranging from October 15, 2018, through August 13, 2023. (R. 92 ¶ 5(22), PageID#:1328). Photographic and video exhibits depict water flowing from Ray's Site into Sulphur Creek — a water of the United States — on those dates, (Exs. 16, 17, 20, 26, 47, Transcript, R. 132, PageID # 1897), and witnesses confirmed continuous flow throughout trial. Once the jurisdictional predicate is met, *Corona Clay* squarely authorizes the procedural-violation theory Riverkeeper pursued. Every circuit to have addressed whether citizen suits may be premised on non-discharge permit violations has held that they may. *See Simkins*, 847 F.2d at 1114-15; *Corona Clay*, 17 F.4th at 833 (Hurwitz, J., joined by Siler, J., of the Sixth Circuit, sitting by designation).

The district court's contrary reading would put this Court at odds with every Circuit Court that has addressed this issue.

Reading a heightened-proof requirement into the citizen-suit provision would frustrate Congress's stated purposes. *See Black Warrior Riverkeeper, Inc. v. Cherokee Mining, LLC*, 548 F.3d 986, 992 (11th Cir. 2008) ("the need to avoid placing obstacles in the path of such citizen suits"). Where, as here, a permit relies on qualitative and visual discharge standards rather than numeric end-of-pipe limits, demanding chemical proof of every challenged discharge would narrow citizen-suit enforcement to plaintiffs with specialized laboratory resources, a result Congress explicitly rejected.

**D. Plaintiff Presented Sufficient Proof of Non-discharge Permit Violations.**

Defendant Ray's GCSP Permit requires preparation and submittal of a site-specific SWPPP. GCSP §5. One of the requirements of the SWPPP is that a site assessment must be conducted at each outfall draining ten or more acres. GCSP, R.58-9, at §5.5.3.8, PageID#: 501 – 590.

The Pretrial Order identified as an issue for the jury whether Defendants violated the GCSP by "failure to conduct and submit a required site assessment or an updated site assessment." R. 92 ¶ 5(9). PageID#:1328. At trial, Ray admitted that he had not prepared and submitted a site assessment, Transcript, R.131, PageID #:1814 – 1816. Riverkeeper introduced evidence that at least one outfall drained ten or more

acres, triggering the requirement. Transcript, R.131, Page ID #: 1814 – 1816. This admission alone defeats Rule 50.

The Pretrial Order separately identified as an issue for the jury whether Defendants violated the GCSP by "failure to implement the Stormwater Pollution Prevention Plan (SWPPP) and maintain effective Best Management Practices (BMPs) from commencement of construction activity until permanent stabilization is complete." R. 92 ¶ 5(14). PageID#:1327. The corresponding GCSP provision is § 1.4.2. Mr. Ray himself testified that his stormwater retention pond, a part of his SWPPP, was not completed until 2023, years after construction activities began. Transcript, R. 131, PageID# 181. This testimony alone defeats Rule 50.

In sum, Riverkeeper presented sufficient evidence on at least two procedural-permit-violation issues the Pretrial Order had certified for jury determination. Either alone is enough to require submission of Count One to the jury.

## II. The District Court Erred in Granting Judgment as a Matter of Law Under Rule 50(a) on Riverkeeper's CWA Claim Where Uncontradicted Photographic, Video, and Testimonial Evidence Depicted Visibly Muddy, Discolored Stormwater Discharging From Defendant's Active Landfill Into Sulphur Creek, and the Rule 50(a) Standard Required all Reasonable Inferences be Drawn in Riverkeeper's Favor.

### A. The GCSP Sets Visual Discharge Limitations With no Numeric Limits.

Neither Tennessee law nor the GCSP imposes numeric limitations on stormwater discharges. The applicable limitations are visual, set out in GCSP § 6.3.

> §6.3.1. This permit does not authorize stormwater or other discharges that would cause or contribute to a violation of a state water quality standard (Tennessee State Rules, Chapters 0400-40-03, 0400-40-04). Such discharges constitute a violation of this permit."
>
> §6.3.2. a) The construction activity shall be carried out in such a manner that *will prevent violations of water quality criteria* as stated in the Tennessee Rules, Chapter 0400-40-03-.03. This includes, but is not limited to, the prevention of any discharge that causes a condition in which visible solids, bottom deposits or turbidity impair the usefulness of waters of the state for any of the uses designated for that water body by Tennessee Rules, Chapter 0400-40-04. Construction activity carried out in the manner required by this permit shall be considered in compliance with the Tennessee Rules, Chapter 0400-40-03-.03.
>
> b) There shall be no distinctly visible solids, scum, foam, oily slick, or the formation of slimes, bottom deposits, or sludge banks of such size or character as may be detrimental to fish and aquatic life.
>
> c) The stormwater discharge must not contain total suspended solids, turbidity, or color in such amounts or character *that will result in any objectionable appearance compared to the turbidity or color of the receiving water*, considering the nature and location of the water.
>
> d) The stormwater discharge shall not contain pollutants in quantities that will be hazardous or otherwise detrimental to humans, livestock, wildlife, plant life, or fish and aquatic life in the receiving stream. This provision includes species covered under Subpart 1.3.

> e) Solids or other materials removed by any sediment control treatment devices must be disposed of in a manner that prevents its entrance into or pollution of any surface or subsurface waters. (Emphasis added).
>
> GCSP, § 6.3, R.58-9, PageID#: 544 - 545.

GCSP § 6.3.1 makes any discharge that "cause[s] or contribute[s] to" a state water-quality standard violation a permit violation in its own right. Section 6.3.2 imposes an affirmative duty "to carr[y] out" construction so as to prevent such violations, and § 6.3.2(c) defines the operative visual standard: a discharge that contains "total suspended solids, turbidity, or color in such amounts or character that will result in any objectionable appearance" violates the permit. Riverkeeper may therefore prove a violation of §§ 6.3.1 or 6.3.2(c) by showing such an objectionable appearance — without quantitative laboratory testing.

The Pretrial Order confirms the operative legal standard. It enumerates as an issue for the jury whether Defendants violated the GCSP "because its stormwater discharge contains total suspended solids, turbidity, or color in such amounts or character that will result in any objectionable appearance" — language tracking GCSP § 6.3.2(c) — and separately whether the discharge "would cause or contribute to a violation of a state water quality standard." R. 92 ¶ 5(19)-(20), PageID#: 1327 – 1328.

## B. The Applicable Water Quality Standard.

The two named bodies of water affected by Ray's discharges are Sulphur Creek and Cumberland River.[3] The water use classifications of Sulphur Creek and its tributaries are Fish and Aquatic Life, Recreation, Livestock Watering and Wildlife, and Irrigation. The water use classifications of Cumberland River in that section are Domestic Water Supply, Industrial Water Supply, Fish and Aquatic Life, Recreation, Livestock Watering and Wildlife, Irrigation and Navigation.

The criteria for the use of **Recreation** are the following.

> Total Suspended Solids, Turbidity, or Color - There shall be no total suspended solids, turbidity or color in such amounts or character that will result in any objectionable appearance to the water, considering the nature and location of the water.
>
> Tenn. Comp. R. & Regs., Chapter 400-40-03-4(d).

### C. Witnesses and Exhibits established Objectional Appearance.

Riverkeeper presented testimonial, photographic, and video evidence from which a jury could find that Ray's stormwater discharges contained total suspended solids, turbidity, or color producing objectionable appearance under GCSP § 6.3.2(c). Because the standard is qualitative, visual proof is the appropriate method; the GCSP

3 A small, unnamed creek, sometimes called Keck's Creek, runs on the edge of Nicholas Kech's property and discharges into Sulphur Creek. As a tributary of Sulphur Creek, it has the same use classification as Sulphur Creek.

does not require chemical analysis, and laboratory testing to determine pollutant concentrations cannot capture a visual standard. GCSP, § 6.3, R.58-9, PageID#: 544 – 545.

Mr. Nicholas Keck testified that, beginning only after Ray opened his landfill, repeated stormwater discharges from the landfill deposited accumulated sediment onto his property and from there into Sulphur Creek. Mr. Keck introduced numerous photos tracing the runoff from Ray's property across his own land and into Sulphur Creek and showed the visible contrast of the discharge with the cleaner waters of Sulphur Creek. Transcript, R.131, PageID#: 1775 – 1790.

Mr. Barry Sulkin introduced photographs he took on June 29, 2023, August 3, 2023, August 12 and 13, 2023, February 9 and 28, 2024, April 11, 2024, and May 8 and 9, 2025. These photographs show visibly muddy water flowing from the base of Mr. Ray's landfill into Sulphur Creek. Transcript, R.132, PageID#:1894 – 1928.

Mr. Frank Canale testified that he observed and filmed stormwater discharges from Mr. Ray's landfill on January 2, 2023. Among his exhibits was a video of a clear drinking glass filled with water he collected from one such discharge — the water was so opaque that nothing could be seen through the glass.

Across the photographic and video evidence, Sulphur Creek visibly changed color where it received water from Ray's landfill. That visual record undermines any inference that nonhuman activity — rather than the landfill operation — caused the discoloration.

**D. Muddy Water is a Pollutant Under the CWA.**

Even if proof of a pollutant discharge was required for every Count One claim, Riverkeeper supplied it. The Clean Water Act defines "pollutant" to include "rock, sand [and] cellar dirt." 33 U.S.C. § 1362(6). The Sixth Circuit has confirmed those are statutory pollutants and has long given the Act's pollution definitions "a generous rather than a niggardly construction." *United States v. Cundiff*, 555 F.3d 200, 213 (6th Cir. 2009); *United States v. Hamel*, 551 F.2d 107, 112-13 (6th Cir. 1977). The same rule prevails in the Eleventh and Ninth Circuits. *Driscoll v. Adams*, 181 F.3d 1285, 1291 (11th Cir. 1999); *Rybachek v. EPA*, 904 F.2d 1276, 1285-86 (9th Cir. 1990).

Three points establish that the muddy stormwater leaving Ray's Site contained pollutants as a matter of law. First, § 1362(6) defines "pollutant" to include "rock, sand [and] cellar dirt," and the Sixth Circuit has confirmed those are statutory pollutants. *Cundiff*, 555 F.3d at 213. Second, the jury found that Ray uses "rock, dirt, stumps, pavement, concrete, and rebar, and/or brick rubble as fill material" at the Site. Verdict, R. 123 at 1, PageID#: 1572. Those materials — placed in fill quantities,

exposed to runoff, and confined to the Site only by the very controls Ray admittedly failed to maintain — are statutory pollutants. Third, where stormwater leaves a fill operation visibly turbid and discolored, "[w]ater cannot be turbid without suspended solids." *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 273 F.3d 481, 489 (2d Cir. 2001). The reasonable inference — required to be drawn in Riverkeeper's favor under Rule 50 — is that the suspended solids are the very materials being placed at the Site. The district court characterized this inference as "rank speculation", (R.137, Page ID#:2127), but it is the precise inference Rule 50 requires the trier of fact to be permitted to draw. *See Imwalle*, 515 F.3d at 543. The district court's contrary conclusion would mean that no plaintiff could prove a sediment-discharge violation without independent laboratory analysis — a requirement the statute does not impose, and one Congress expressly disclaimed by enumerating "rock, sand [and] cellar dirt" within § 1362(6) itself.

This is the consensus rule in citizen-suit cases involving development-site runoff: turbidity from "silt and sediment-laden water," documented through visible discoloration alone, suffices to establish a sediment-discharge violation without chemical analysis. *City of Mountain Park v. Lakeside at Ansley, LLC*, 560 F. Supp. 2d 1288, 1296 (N.D. Ga. 2008); *N.C. Shellfish Growers Ass'n v. Holly Ridge Assocs., LLC*, 278 F. Supp. 2d 654, 676 (E.D.N.C. 2003).

### E. A Jury May Infer the Existence of a Pollutant from Direct or Circumstantial Evidence.

The standard of proof is a preponderance of the evidence. *United States v. Sweeney*, 483 F. Supp. 3d 871, 893 (E.D. Cal. 2020) (preponderance is "the applicable standard of proof of a [CWA] violation in a civil enforcement action").

Reasonable inferences from circumstantial evidence are sufficient to defeat a Rule 50 motion. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000) (court must "draw all reasonable inferences in favor of the nonmoving party" on Rule 50 review); *Imwalle*, 515 F.3d at 543 (same; circumstantial evidence and reasonable inferences therefrom suffice to defeat Rule 50). Here the jury was entitled to infer from the visual evidence — uncontradicted muddy water leaving a fill operation, sediment deposited on neighboring property, dramatic discoloration of the receiving water at the discharge point — that the discharges contained the very materials the jury found Ray was using as fill. *See Cundiff*, 555 F.3d at 213; *Catskill Mountains*, 273 F.3d at 489.

The bedrock of the Clean Water Act is "a default regime of strict liability, whereby the discharge of any covered pollutant from a point source into the Nation's waters amounts to a violation of the statute unless subject to a specific exception." *Sierra Club v. ICG Hazard, LLC*, 781 F.3d 281, 284 (6th Cir. 2015) (quoting *Piney*

*Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty.*, 268 F.3d 255, 268-69 (4th Cir. 2001)).

Riverkeeper presented sufficient evidence on three independent grounds, any one of which defeats Rule 50: procedural-permit violations actionable under § 1365(f) without proof of discharge; visual permit-standard violations established through testimonial, photographic, and video evidence; and statutory-pollutant discharges supported by the jury's own fill-material finding and the Sixth Circuit's "generous rather than niggardly" construction of § 1362(6). The Court should reverse and remand for trial on Count One.

## Ill. The District Court Erred in Instructing the Jury to Consider Tennessee's Regulatory Exemption for a Solid Waste Disposal Permit for A Class IV Construction and Demolition Landfill.

### A. The Instructional Error.

The district court instructed the jury that Ray could establish the fill-material exemption found in Tenn. Comp. R. & Regs. 0400-11-01-.02(1)(b)(3)(xiii) as a matter of state law. The jury accepted that defense and found that Ray uses "rock, dirt, stumps, pavement, concrete and rebar, and/or brick rubble as fill material." Verdict, R. 123, PageID#: 1572. The district court then applied the exemption as a matter of law to defeat Count Two — even though the same jury had separately found that Ray's site is a Class IV construction and demolition landfill. (*Id.*)

That instruction was error for two independent reasons. First, the exemption is ambiguous, and the canons of construction require it to be read narrowly to avoid creating a regulatory gap — one that converts a facility from sanitary landfill to prohibited open dump precisely by exempting it from the federal floor. Second, even if the exemption were unambiguous, its application here is preempted by RCRA as applied.

## B. The Open-Dumping Framework Operates as the Legal Predicate, Not a Freestanding Cause.

In its statement of findings, Congress stated in 42 U.S.C. 6901:

> (2) disposal of solid waste and hazardous waste in or on the land without careful planning and management can present a danger to human health and the environment;
>
> (4) open dumping is particularly harmful to health, contaminates drinking water from underground and surface supplies, and pollutes the air and the land;

The objectives of RCRA, found in 42 USC 6902(a), are as follows:

> The objectives of this chapter are to promote the protection of health and the environment and to conserve valuable material and energy resources by-
> …
> (3) prohibiting future open dumping on the land and requiring the conversion of existing open dumps to facilities which do not pose a danger to the environment or to health;
> …

> (10) promoting the demonstration, construction, and application of solid waste management, resource recovery, and resource conservation systems which preserve and enhance the quality of air, water, and land resources.

Congress defined Open Dump and Sanitary Landfill in 42 U.S.C. § 6903, as follows:

> (14) The term "open dump" means any facility or site where solid waste is disposed of which is not a sanitary landfill which meets the criteria promulgated under section 6944 of this title and which is not a facility for disposal of hazardous waste.
>
> (26) The term "sanitary landfill" means a facility for the disposal of solid waste which meets the criteria published under section 6944 of this title.

The objectives of subchapter IV are stated in 42 USC 6941 as follows:

"The objectives of this subchapter are to assist in developing and encouraging methods for the disposal of solid waste which are environmentally sound…"

42 U.S.C. 6944 sets the criteria for sanitary landfills to include:

a. At a minimum, such criteria shall provide that a facility may be classified as a sanitary landfill and not an open dump only if there is no reasonable probability of adverse effects on health or the environment from disposal of solid waste at such facility.

b. For purposes of complying with section 6943(2) of this title each State plan shall prohibit the establishment of open dumps and contain a requirement that disposal of all solid waste within the State shall be in compliance with such section 6943(2) of this title.

42 U.S.C. 6943 sets out minimum requirements for state plans to include:

(2) The plan shall, in accordance with sections 6944(b) and 6945(a) of this

> title, prohibit the establishment of new open dumps within the State, and contain requirements that all solid waste (including solid waste originating in other States, but not including hazardous waste) shall be (A) utilized for resource recovery or (B) disposed of in sanitary landfills (within the meaning of section 6944(a) of this title) or otherwise disposed of in an environmentally sound manner.
>
> (6) The plan shall provide for such resource conservation or recovery and for the disposal of solid waste in sanitary landfills or any combination of practices so as may be necessary to use or dispose of such waste in a manner that is environmentally sound.

Congress went further and specifically prohibited open dumps and provided a right of action to enforce the prohibition. This is found in 42 U.S.C. 6943(a) as follows:

> Upon promulgation of criteria under section 6907(a)(3) of this title, any solid waste management practice or disposal of solid waste or hazardous waste which constitutes the open dump dumping of solid waste or hazardous waste is prohibited ... The prohibition contained in the preceding sentence shall be enforceable under section 6972 of this title against persons engaged in the act of open dumping.

This section makes clear that there is a private right of action under the citizen suit provision against those engaged in open dumping and this prohibition is independent of any provision found in a state plan. See, *Blue Legs v. U.S. E.P.A.*, 668 F.Sup. 1329 (D. S.D. 1987).

## C. Defendant Ray's Class 4 Landfill Qualifies as an Open Dump.

Defendant Ray's site is an Open Dump and prohibited under the Act. It is an open dump because it meets the definition of open dump in USCA 6903(14) in that it is a facility where solid waste is disposed of which is not a sanitary landfill which meets the criteria promulgated under section 6944 and is not a facility for disposal of hazardous waste.

There is no doubt that it is a facility where solid waste is disposed. This question was answered when the jury found that it is a landfill.

It is an open dump because it cannot be said that there is no reasonable probability of adverse effects on the environment from the facility. Section 6944 which states as follows:

> At a minimum, such criteria shall provide that a facility may be classified as a sanitary landfill and not an open dump only if there is no reasonable probability of adverse effects on health or the environment from disposal of solid waste at such facility.

Adverse effects on the environment from the facility was demonstrated by the Plaintiff at trial. Riverkeeper introduced evidence of sediment-laden discharges, downstream impacts to Sulphur Creek, violations of water quality standards and other permit violations. Riverkeeper also introduced evidence that Ray violated the requirements of his NPDES GCSP permit and caused pollutants to be discharged,

which statutorily qualifies Ray's landfill as an open dump. There is plainly a reasonable probability of adverse effects on the environment. Under 42 U.S.C. § 6944(a), this disqualifies Mr. Ray's facility as a "sanitary landfill."

Promulgated under section 6944 are the criteria in 40 CFR 257.1 through 257.4. Section 257.1 which includes the following:

> a) Unless otherwise provided, the criteria in §§ 257.1 through 257.4 are adopted for determining which solid waste disposal facilities and practices pose a reasonable probability of adverse effects on health or the environment under sections 1008(a)(3) and 4004(a) of the Resource Conservation and Recovery Act (The Act). …
>
> (1) Facilities failing to satisfy any of the criteria in §§ 257.1 through 257.4 or §§ 257.5 through 257.30 or §§ 257.50 through 257.107 are considered open dumps, which are prohibited under section 4005 of the Act.

The criteria in §§ 257.1 through 257.4 include protections for floodplains, endangered species, surface water, and ground water. The requirements of 257.3-3 are protective of surface water and include section (a) which requires that a facility shall not cause a discharge of pollutants into waters of the United States that is in violation of the requirements NPDES under section 402 of the Clean Water Act, as amended.

The failure of the state program to require Ray to obtain a landfill permit, or at least to submit an application for an exemption so that his facility can be evaluated for compliance means there is no protection under the state provision to ensure protection

of the criteria in §§ 257.1 through 257.4. This failure has adversely affected the environment in a number of ways. Testimony and exhibits at trial demonstrated discharges of contaminated stormwater from the site and the accumulation of sediment off site and violations of water quality standards.

A person required to have a permit must prepare and submit an application which allows the state to evaluate compliance with regulations. Ray was not required to submit any application or even a request for the exemption he now claims.

The landfill permit application is designed to insure compliance with RCAA. It consists of two parts. Part 1 includes the activities to be conducted which require a permit. It must include the zoning status of the property and a topographic map extending one-half mile beyond the property boundaries, which must depict wells, springs, other surface water bodies, and drinking wells.

Part 2 of the application must include a hydrogeological report which, among other things, must contain a comprehensive environmental site assessment that includes an evaluation of the quality of groundwater beneath the proposed facility. Tenn. Comp. R. & Regs. 0400-11-01-.04-(9)(a)6(i).

The application must also contain engineering plans Tenn. Comp. R. & Regs. 0400-11-01-.04-(9) (b) , a narrative description of the facility and operations Tenn.

Comp. R. & Regs. 0400-11-01-.04-(9) (c), and a closure/post-closure plan. Tenn. Comp. R. & Regs. 0400-11-01-.04-(9) (d).

Because it was not required to submit an application of any kind, Ray was not required to provide any of that information.

Once the application is complete a tentative decision is made whether the permit should be issued or denied. Tenn. Comp. R. & Regs. 0400-11-01-.02-(c). If the decision is to issue the permit, a draft permit must be prepared. Public notice must be issued and public comments accepted. Tenn. Comp. R. & Regs. 0400-11-01-.02-(e). A public hearing must be held if there is "a significant degree of public interest in a draft permit." Tenn. Comp. R. & Regs. 0400-11-01-.02-(g). Because it was not required to submit an application of any kind, Ray's landfill was not subject to public notice, public comment, or a public hearing.

The Jackson Law, T.C.A. Title 68, Chapter 211, Part 7, allows a local government to approve or disapprove a proposed new construction for a landfill or solid waste disposal facility. Tenn. Comp. R. & Regs. 0400-11-01-.02-(1)(c)(2). Because it was not required to submit an application of any kind, Ray's site was not subject to local approval.

A final permit may then be issued. Tenn. Comp. R. & Regs. 0400-11-01-.02-(i). The permit must include terms and conditions as necessary to achieve compliance with the state act and regulations and as otherwise necessary to protect human health and the environment.

Class IV landfill permits were phased out after July 1, 2008. Tenn. Comp. R. & Regs. 0400-11-01-.04-(1)(b)(5), and those facilities must now apply for Class III permits since the facilities are the same except Class III allows more types of materials than Class IV did.

Standards are set by Tenn. Comp. R. & Regs. 0400-11-01-.04 which facilities must meet in order to obtain a landfill permit. Tenn. Comp. R. & Regs. 0400-11-01-.04(1)(a). These standards include siting requirements, protection of the environment from runoff, protection of wetlands and scenic rivers. It requires that there must be a geologic buffer underlying all solid wastes. It includes waste handling and cover standards, ground water protection and monitoring standards and closure and post-closure standards.

These permitting requirements insure the criteria in 40 C.F.R. §§ 257.1 through 257.4 are met so the permitted landfills are sanitary landfills where there is no probably of adverse effects on the environment, and not open dumps. By claiming the

exemption and failing to apply for a permit, Ray has dodged these protections. He was not required to show his landfill proposal would meet these requirements. The result is that his facility is not a sanitary landfill and is, instead, a prohibited open dump which is harmful to the environment, as demonstrated at trial.

### D. The Exemption Is Ambiguous and Must Be Construed Narrowly.

The exemption permits "[t]he use of solely natural rock, dirt, stumps, pavement, concrete and rebar, and/or brick rubble as fill material." Tenn. Comp. R. & Regs. 0400-11-01-.02(1)(b)(3)(xiii). Two operative terms — "use" and "fill" — are undefined and have not been construed by any Tennessee court.

The drafters' choice of "use" rather than "disposal" was not casual. Nine other exemptions in the same paragraph (3) employ "disposal," and several couple "disposal" with protective limitations such as "fill area of less than one acre in areal extent when completed." Tenn. Comp. R. & Regs. 0400-11-01-.02(1)(b)(3)(iv)-(vi). Only one other exemption in paragraph (3) uses "use" — subsection (xxi), which expressly defines its scope as "[t]he beneficial use of waste, which does not constitute disposal, that the generator demonstrates, to the satisfaction of the Commissioner, is not detrimental to public health, safety, or the environment." Tenn. Comp. R. & Regs. 0400-11-01-.02(1)(b)(3)(xxi) (emphasis added).

The disparate inclusion of "disposal" in some subsections and "use" in others

must be presumed intentional. *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."); *see City of Chicago v. Env't Def. Fund*, 511 U.S. 328, 338 (1994) (internal quotations omitted) (applying the canon to environmental regulation). The most natural reading of subsection (xiii), in light of subsection (xxi), is that it permits *beneficial use* — not disposal — of the listed materials.

That reading aligns with EPA's own framework for distinguishing beneficial use from disposal under RCRA. In its Coal Combustion Residuals Rule, EPA articulated four criteria for beneficial use: (1) the material must provide a functional benefit; (2) it must substitute for the use of a virgin material, conserving natural resources that would otherwise be obtained through extraction; (3) it must meet relevant product specifications, regulatory standards, or industry standards when available; and (4) it must be used in quantities consistent with the function it is intended to perform. 80 Fed. Reg. 21302, 21348 (Apr. 17, 2015). EPA explained that placement of waste materials "in quantities significantly exceeding what is necessary for the function in question" constitutes "prima facie discard" — sham fill, not beneficial use. Id. EPA cited AES Puerto Rico's coal-ash placement practices as an

example of placement that did not satisfy the beneficial-use criteria. Id. at 21351. Ray's operation fails each of EPA's criteria. The jury found that Ray's site is a Class IV construction and demolition *landfill* — a facility for solid-waste disposal — at which the listed materials are placed in fill quantities. Verdict, R. 123, PageID#: 1572. Placement in fill quantities at a landfill site is disposal, not beneficial use. Construing subsection (xiii) to permit Ray's operation would convert his facility from a sanitary landfill (had he sought a permit and submitted to evaluation under 40 C.F.R. §§ 257.1-257.4) into a prohibited open dump (because no permit was sought, no application submitted, and no evaluation conducted). That construction creates the very regulatory gap RCRA was enacted to close. Courts do not adopt regulatory readings that produce results inconsistent with the regulatory scheme. *Cf. Kisor v. Wilkie*, 588 U.S. 558, 575 (2019) (regulatory interpretation begins with text and structure; a reading that produces an outcome the regulatory scheme forbids is presumptively wrong).

**E. The Exemption As Applied Is Preempted.**

If subsection (xiii) is construed broadly enough to authorize Ray's operation — that is, to permit the placement of solid waste in fill quantities at an unpermitted Class IV landfill, without any application, evaluation, or compliance with 40 C.F.R. §§ 257.1-257.4 — that construction is preempted by RCRA as applied. State law may not authorize what federal law prohibits. *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)

(state law preempted where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"); *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98, 108 (1992) ("[A]ny state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." (citation omitted)).

RCRA permits a facility to be classified as a sanitary landfill — and therefore not an open dump — only if "there is no reasonable probability of adverse effects on health or the environment from disposal of solid waste at such facility." 42 U.S.C. § 6944(a). The 40 C.F.R. § 257 criteria implement that floor, and they require operators to satisfy surface-water, groundwater, floodplain, and other protective standards before a facility may operate as a sanitary landfill. *S. Rd. Assocs. v. IBM*, 216 F.3d 251, 256-57 (6th Cir., 2000).

The structural problem with Tennessee's exemption, as applied to Ray, is not that Ray operated badly. It is that Ray operated *without ever being evaluated* — without ever submitting an application, without ever providing a hydrogeological assessment, without ever being measured against the § 257 criteria. The exemption removed Ray's facility from the regulatory framework Congress designed to prevent open dumps; the absence of evaluation is the regulatory gap. Whether or not Ray's facility would have satisfied the § 257 criteria had it been evaluated is beside the

point: RCRA's federal floor requires the evaluation. Tennessee's exemption, applied to permit fill-quantity disposal at an unpermitted landfill, eliminates the evaluation entirely. That is the result the Supremacy Clause forbids. U.S. Const., art. VI, cl. 2; *Davis v. Sun Oil Co.*, 148 F.3d 606, 609-10 (6th Cir, 1998).

This is an as-applied preemption challenge, not a facial one. Riverkeeper does not contend that Tennessee's regulatory scheme is preempted in its entirety, or that subsection (xiii) is preempted in every conceivable application. Subsection (xiii) may have legitimate beneficial-use applications consistent with EPA's four-criteria test — for example, the use of clean concrete rubble as base material in a construction project, in quantities consistent with the construction's function. But the exemption cannot be applied to authorize fill-quantity disposal at an unpermitted landfill. That application creates the regulatory gap RCRA was enacted to close.

**F. The Error Was Not Harmless.**

The instructional error directly produced the verdict. The jury's answer to Question 2 was the exemption defense; the district court then applied that finding as a matter of law to defeat Count Two. (*See* Verdict, R. 123, PageID#: 1572; Judgment, R. 124, PageID#: 1573.) There is no construction of the record on which the error did not affect the outcome — the instruction supplied the legal framework for the very

finding that defeated Riverkeeper's claim. *See, e.g.*, *Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 585 F.3d 267, 274 (6th Cir. 2009).

## CONCLUSION

For the reasons presented, the District Court's grant of Defendant's Rule 50 motion dismissing Count One should be reversed and a new trial granted as to the Clean Water Act allegations in Count One.

This Court should reverse the judgment on Count Two and remand for entry of judgment in Riverkeeper's favor on liability. The jury's finding that Ray's site is a Class IV landfill is undisturbed; once the exemption defense is held legally unavailable on these facts, no factual finding remains to support the judgment for Defendants.

In the alternative, this Court should remand for a new trial on Count Two with the jury properly instructed that the fill-material exemption does not authorize fill-quantity disposal at an unpermitted Class IV landfill. Either disposition vacates the existing judgment.

/s Mark E. Martin
Mark E. Martin
PO Box 1486
Oneonta, AL 35121
(205) 516-9350
Counsel for Appellee
Tennessee Riverkeeper, Inc.

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because it contains 9,972 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

# ADDENDUM

## DESIGNATION of RELEVANT DOCUMEMTS

| R. | Page ID# Range | Description |
|---|---|---|
| 48 | 274 – 301 | Amended Complaint |
| 92 | 1323 - 1331 | Pretrial Order |
| 117 | 1507 - 1516 | Plaintiff's Briefing on Proof of Pollutants |
| 123 | 1572 | Jury Verdict Form |
| 124 | 1573 | Judgment |
| 125 | 1574 - 1581 | Memorandum Opinion and Order |
| 126 | 1582 - 1584 | Plaintiff's Rule 59(a),(e) Motion |
| 126-1 | 1585 - 1604 | Plaintiff's Memorandum in Support of Rule 59(a),(e) Motion |
| 137 | 2117 - 2130 | The District Court's Memorandum Opinion |
| 138 | 2131 | Order denying Rule 59 Motion |
| 139 | 2132 | Notice of Appeal |